UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                       SOUTHEASTERN DIVISION

VALLIE B. McCORMICK,             )
                                 )
            Plaintiff,           )
                                 )
      v.                         )     No. 1:05 CV 204   RWS
                                 )                        DDN
LINDA S. McMAHON,[1]             )
Acting Commissioner of           )
Social Security,                 )
                                 )
            Defendant.           )

              **REPORT AND RECOMMENDATION**
              **OF UNITED STATES MAGISTRATE JUDGE**

   This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security partially denying the application of plaintiff Vallie B. McCormick for supplemental security income under Title XVI of the Social Security Act (the Act), 42 U.S.C. § 1381 et seq. The action was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b).

                        **1.  Background**

   On March 15, 1999, plaintiff applied for disability benefits. She alleged she became disabled on March 1, 1994, at the age of 44, due to chest injury, upper back problems, neck problems, depression, migraines, breathing problems, anxiety attacks, stress, and a lump in her chest area. (Tr. 92-93, 110.) On March 2, 2000, her alleged onset date was amended to March 30, 1999. (Tr. 99.)

   Following a hearing, the administrative law judge (ALJ) found that plaintiff was not disabled. (Tr. 37-47.) The Appeals Council remanded the case for a supplemental hearing and new decision. (Tr. 61-63.) On

---

[1] Linda S. McMahon became the Acting Commissioner of Social Security on January 20, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Linda S. McMahon is substituted for Commissioner Jo Anne B. Barnhart as defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

August 2, 2002, the ALJ found that plaintiff became disabled on March 10, 2001, but was not disabled before that time. (Tr. 13-21.) Because the Appeals Council denied review of the August 2, 2002 decision, it became the final decision of the Commissioner for review in this action.

## 2. General Legal Principles

The court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole. Pelkey v. Barnhart, 433 F.3d 575, 577 (8th Cir. 2006). "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that detracts from, as well as supports, the Commissioner's decision. See Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000). So long as substantial evidence supports that decision, the court may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment which would either result in death or which has lasted or could be expected to last for at least 12 months. See 42 U.S.C. § 1382c(a)(3)(A). A five-step regulatory framework governs the evaluation of disability in general. Bowen v. Yuckert, 482 U.S. 137, 140-41 (1987) (describing the five-step process); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir. 2003). If the Commissioner finds that a claimant is disabled or not disabled at any step, a decision is made and the next step is not reached. 20 C.F.R. § 404.1520(a)(4).

Here, the ALJ determined that plaintiff was unable to perform her past relevant work because she had none. Therefore, the burden shifts to the Commissioner to show that there are jobs plaintiff could have

performed prior to March 10, 2001. See Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995).

### 3. The ALJ's decision

In the August 2, 2002 decision partially denying benefits, the ALJ found that plaintiff suffered from vertigo, dizziness, chronic obstructive pulmonary disease,[2] venous stasis,[3] cervical degenerative disc disease,[4] costochondritis,[5] a displaced left humerus fracture, a right thumb fracture, bipolar disorder[6] with depression anxiety, a schizoaffective disorder,[7] post-traumatic stress disorder,[8] and substance

---

[2]Chronic obstructive pulmonary disease (COPD) is a long term lung disease where the airways to and in the lungs are partially blocked, making it difficult for a person diagnosed with this disease to breathe. Webmd.com/hw/lung_disease/hw32561.asp. (Last visited January 23, 2007.)

[3]A condition that occurs when the veins do not move blood back toward the heart normally, and a shallow wound develops. Webmd.com/hw/skin_and_beauty/tn8005.asp. (Last visited January 23, 2007.)

[4]Degenerative disc disease of the lower neck, or cervical region, that occurs when the spine discs break down and put pressure on the spinal cord and nerves. Webmd.com/hw/back_pain/tp22215.asp?pagenumber=2. (Last visited January 23, 2007.)

[5]Costochondritis is an inflammation of the area where the upper ribs join the cartilage that holds them to the breastbone or sternum. Available at www.emedicinehealth.com/costochondritis/article_em.htm. (Last visited January 23, 2007.)

[6]Bipolar disorder is a mental disorder characterized by extreme mood changes, from mania to depression. A person may experience normal moods between the mood swings. Webmd.com/content/article/102/106771.htm. (Last visited January 23, 2007.)

[7]Schizoaffective disorder is a serious mental illness that contains symptoms of both schizophrenia and either depression or bipolar disorder. Webmd.com/content/article/60/67124.htm. (Last visited January 23, 2007.)

[8]Post-traumatic stress disorder is a type of anxiety disorder that develops after a person experiences a traumatic event. Webmd.com/hw/mental_health/hw184190.asp. (Last visited January 23, 2007.)

abuse. None of these impairments met or equaled any listed impairment. (Tr. 17-18.)

The ALJ found that, prior to March 10, 2001, plaintiff maintained the residual functional capacity (RFC) to engage in all work activity but for lifting above her head or reaching above her head with her left hand. She required limited social interaction. As of March 10, 2001, plaintiff became unable to interact appropriately with others or to be reliable and maintain concentration. (Tr. 18.)

The ALJ noted that plaintiff responded well to treatment throughout 2000 except for a "flare up" of symptoms in July 2000[9] that responded to medical therapy. The ALJ noted that plaintiff did not require hospitalization again until March 10, 2001 for hearing voices and depression and bipolar disorder. The ALJ found that there was no physical limitation that could not be resolved with medical compliance. He noted she did not follow doctor's directions with regard to her bone fractures and she smokes a pack of cigarettes a day. (Tr. 18.)

The ALJ considered plaintiff's subjective complaints of her situation and found them generally credible after March 10, 2001, but not prior to as set forth in the August 2000 decision.[10]

### 4. Plaintiff's Grounds for Relief

Plaintiff argues that the decision of the ALJ, that she was not disabled until March 10, 2001, is not supported by substantial evidence. Specifically, she argues that the ALJ disregarded the consistency of her psychiatric impairments since at least September 13, 1999.

---

[9]On July 24, 2000, plaintiff was admitted to the hospital because voices were telling her to do "all kinds of things." (Tr. 327-29.)

[10]The ALJ discussed plaintiff's medical history prior to March 10, 2001 in the August 2000 opinion. The ALJ noted that plaintiff underwent treatment at a psychiatric facility from September 29, 1999 until December 15, 1999. She participated in group therapy. He noted that plaintiff forgot to take her medication. He found some of plaintiff's complaints inconsistent. The ALJ found that plaintiff had the RFC to perform all exertional work, and was limited in her ability to reach overhead, and in her ability to carry out detailed instructions. (Tr. 37-47.)

### 5. Discussion

Plaintiff argues that the ALJ ignored her psychiatric problems before March 10, 2001 when determining her RFC.

The RFC is "the most [a claimant] can still do despite" his or her "physical or mental limitations." 20 C.F.R. § 404.1545(a). When determining plaintiff's RFC, the ALJ must consider "all relevant evidence" but ultimately the determination of the plaintiff's RFC is a medical question. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). As such, the determination of plaintiff's ability to function in the workplace must be based on some medical evidence. Id.; see also Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).

Prior to March 10, 2001, the ALJ determined that plaintiff had the following RFC:

> to engage in all work activity but for lifting above her head or reaching above her head with her left hand. She also requires routine work with limited social interaction . . .

(Tr. 18.)

There is not substantial evidence supporting the RFC attributed to plaintiff before March 10, 2001. A close review of the record is necessary here to understand the nature of plaintiff's psychiatric ailments.

On April 19, 1999, plaintiff reported having hallucinations and problems finishing tasks. She reported preferring to be alone, and that she slept poorly because of bad dreams and stress. Plaintiff reported she did not like groups of people, that she did not trust people, that she was afraid of people, that she rarely talked on the telephone, and that she rarely went to sporting events, church, or out to eat. (Tr. 119-21.)

On June 11, 1999, plaintiff reported problems concentrating and completing tasks, that she was forgetful and had hallucinations, and that she felt someone was watching her and trying to harm her. She preferred being alone, she slept poorly and was afraid to go to sleep. She did not enjoy being around other people, and would get angry when lied to, or if someone stole from her, brought drugs into her home, or followed her. (Tr. 124-27.)

On June 16, 1999, plaintiff underwent a consultive psychological examination by Gregory C. Rudolph, Ph.D. Plaintiff complained of headaches which would last for three to four days at a time. Plaintiff reported a history of sexual abuse by two of her brothers. She had a history of alcohol abuse, and at one time reported drinking up to a case of beer a day. Dr. Rudolph diagnosed plaintiff with post traumatic stress disorder, depression, and a history of alcoholism. (Tr. 201-04.)

On September 13, 1999, plaintiff went to a medical clinic complaining of sleep problems and depression. She was diagnosed with anxiety and depression and given Celexa.[11] (Tr. 230.)

On September 14, 1999, plaintiff visited with Zinia Thomas for a mental health evaluation. Plaintiff complained that her boyfriend of six years was stalking her and tried to kill her and her children in the past by shooting at them and throwing Chinese stars at them. She complained of extreme anxiety, chest pain, palpitation, tremors, nausea, and vomiting. She admitted to trying to kill herself and her children by trying to drive into a train. She no longer had thoughts of suicide but wanted "to take a crowbar" to her ex's head. She reported hearing voices, resembling her ex-boyfriend's and brother's, that threaten her. She complained of visual hallucinations, including her ex-boyfriend in her closet with a skeleton head. Plaintiff was raped by her older brothers from age five until she was a teen. Her mother did not believe her. She was assessed with a Global Assessment of Functioning (GAF) score of 65.[12] (Tr. 232-33.)

On September 29, 1999, plaintiff began group therapy with V. Jose Thomas, M.D. She was quiet and did not interact with the group. Plaintiff showed cognitive distortions and tolerated her medicines. Dr.

---

[11]Celexa is an antidepressant used to treat depression and other mental disorders. Webmd.com/drugs. (Last visited January 19, 2007.)

[12]A GAF of 65 indicates "some mild symptoms" and "some difficulty in social, occupational, or school functioning." Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2001).

-6-

Thomas continued plaintiff on Risperdal[13] and Remeron.[14] After two months of group therapy, plaintiff complained that she still feared her ex-boyfriend. Plaintiff was anxious, tense, and restless. Dr. Thomas noted plaintiff had a blunted effect, cognitive disorders, and irritability. She reported in December 1999 of being "mad but getting used to it." She suspected her ex-husband was watching her. Dr. Thomas diagnosed her with major depression with psychotic disorder. He assessed her with a GAF of 65. (Tr. 255-65.)

At an October 1999 group therapy session with Dr. Thomas, plaintiff reported her boyfriend had tried to kill her and her children by blowing them up. (Tr. 256-57.) From October through December 1999, Dr. Thomas assessed her with a GAF of 65. (Tr. 255-65.)[15]

On January 4, 2000, plaintiff began seeing Julius S. Clyne, M.D., for psychiatric treatment. Plaintiff complained of hand tremors, feelings of worthlessness, fear of others, poor appetite, nightmares, and decreased sleep. She was nervous. She was assessed with schizoaffective disorder, and prescribed Celexa, Remeron, and Zyprexa.[16] (Tr. 249-50.)

In a letter dated February 16, 2000, Dr. Clyne opined that plaintiff was being treated for schizoaffective disorder and, due to anxiety and depression, she was not able to "actively hold down a job." (Tr. 247.)

On March 15, 2000, plaintiff was admitted to the hospital because she reported hearing voices. She reported not being able to fill her medications. The voices were telling her to kill herself. She

---

[13]Risperdal (Risperidone) is used to treat mental and mood disorders such as schizophrenia and bipolar disorder. Webmd.com/drugs. (Last visited January 19, 2007.)

[14]Remeron (Mirtazapine) is used to treat depression. Webmd.com/drugs. (Last visited January 19, 2007.)

[15]Pages 265 to 282 were inadvertently left out of the administrative record filed on January 3, 2006. (Doc. 12.) The omitted pages were filed on May 8, 2006.

[16]Zyprexa is used to treat schizophrenia and bipolar disorder. Webmd.com/drugs. (Last visited January 19, 2007.)

complained of insomnia, loss of interest, loss of energy, hopelessness, crying spells, and difficulty concentrating. During her hospital stay, she underwent medicine management, psychotherapy, and group therapy. The voices and suicidal thoughts subsided during admission. She was discharged on March 18 with a GAF of 60.[17] (Tr. 266.)

On June 15, 2000, plaintiff reported feeling "fairly good," and that she was sleeping well but not eating well and had suicidal thoughts. Dr. Clyne continued her on Remeron, Zyprexa, and Paxil.[18] (Tr. 326.)

In July 24, 2000, plaintiff was admitted to the hospital because voices were telling her to do "all kinds of things." She was paranoid and depressed. The voices told her she was going to be hurt or killed. The voices, which she thought were her brother's, told her that she would be killed if she were around men. She found herself holding a hammer in the middle of the night, and doing "strange things." She reported depression, loss of interest, feelings of hopelessness, crying spells, difficulty concentrating, and a short attention span. She suffered from visual hallucinations. Dr. Clyne gave her a GAF score of 30.[19] While admitted, plaintiff was treated with medications, psychotherapy, activity therapy, and group therapy. At discharge, on July 28, 2000, Dr. Clyne diagnosed plaintiff with bipolar disorder, depressed type in remission, and gave her a GAF score of 60. (Tr. 327-29.)

On August 15, 2000, plaintiff visited Dr. Clyne for counseling. She did not want to leave her house very often, but she reported

---

[17]A GAF score of 60 indicates moderate symptoms, or "moderate difficulty in social, occupational, or school functioning . . ." Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2001).

[18]Paxil is an antidepressant used to treat depression and other mood and mental disorders. Webmd.com/drugs. (Last visited January 19, 2007.)

[19]A GAF score of 30 indicates behavior that is "considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment. . . OR inability to functioning in most areas . . ." Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2001),

sleeping well and having a good appetite. She reported "freezing" with men. (Tr. 332.)

On January 11, 2001, plaintiff returned to Dr. Clyne and reported "feeling stable" and denied hearing voices or having suicidal thoughts. She did report a recent panic attack. (Tr. 336.)

On March 9, 2001, plaintiff visited Dr. Clyne complaining of voices that were telling her to hurt her daughter. Dr. Clyne diagnosed plaintiff with bipolar disorder.

On March 10, 2001, plaintiff was admitted to the hospital for depression, auditory hallucinations, and paranoid ideation. Plaintiff contemplated suicide by jumping off a bridge. She had no visual hallucinations. She was discharged on March 14, 2001, and it was noted she improved rapidly with milieu therapy, group therapy, chemotherapy, supportive psychotherapy, activity therapy, and no longer had suicidal ideation, plans, or intent. (Tr. 339-41.)

There is no detailed reason in the ALJ's decision, nor in the record, why the ALJ chose March 10, 2001 as the disability onset date. There is no substantial evidence on the record supporting the RFC attributed to plaintiff before that date, and the ALJ improperly discredited plaintiff's subjective complaints. See Duncan v. Barnhart, 368 F.3d 820, 822-23 (8th Cir. 2004) (evidence supports disability considering diagnosis of post-traumatic stress disorder, depression, and history of sexual abuse, alcohol abuse, and depression).

There is medical evidence that supports a finding that plaintiff had mental limitations more severe than limited social conduct prior to March 10, 2001. March 10, 2001, was not her first hospitalization for mental illness, but her third. The ALJ did not discuss plaintiff's March 2000 hospitalization.[20] Between visits, she was participating in therapy and was on medication for bipolar disorder, schizoaffective disorder, and depression. Repeatedly plaintiff complained of paranoia, visual and auditory hallucinations, depression, anxiety, and suicidal thoughts. She required hospitalization in March 2000, July 2000, and

---

[20]The ALJ briefly discusses this hospitalization in the August 2000 opinion, but he noted that she was better at discharge and was responding to medication. (Tr. 43-44.)

March 2001.  Her mental problems at this time were more than one "flare up" in July 2000, as the ALJ contends.

The ALJ noted that plaintiff recovered after her hospital stays and was given a GAF of 65 by Dr. Thomas, indicating only mild symptoms.  However, the ALJ is not free to consider only the GAF, especially when that doctor consistently documents the plaintiff's disabilities.  See Duncan, 368 F.3d at 824.  While plaintiff may have been better after her hospital stays, there is no indication she was cured of her ailments or that they were fully controlled.  On the contrary, she often continued to participate in therapy, and returned to the hospital at least three different times for recurring problems.

No doctor opined that she was malingering.  Her complaints of suicidal thoughts, paranoia, and hallucinations were consistent.  See Thomas v. Sullivan, 876 F.2d 666, 669-70 (8th Cir. 1989) (complaints were consistent, both in written responses and testimony).  She regularly sought treatment.  See Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995).  She was taking medication from at least September 1999.  See O'Donnell v. Barnhart, 318 F.3d 811, 819 (8th Cir. 2003).  There is not substantial evidence in the record that supports a finding that plaintiff was credible after March 2001, but not before.

In summary, there is not substantial evidence on the record supporting the RFC attributed to plaintiff before March 10, 2001.  The record overwhelmingly supports a finding of disability based upon plaintiff's mental condition from the time of her September 1999 clinic visit, mental health evaluation, and beginning of group therapy.  This is a sufficient basis to remand for an award of a period of disability beginning at that time, with resulting benefits.  Taylor v . Chater, 118 F.3d 1274, 1279 (8th Cir. 1997)(remand for award of benefits where record overwhelmingly supports finding of disability); Olson v. Shalala, 48 F.3d 321, 323 (8th Cir. 1995)(same).

## RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be reversed and remanded under Sentence 4 of 42 U.S.C.§ 405(g).  Upon

remand, the Commissioner should award disability benefits based upon a period of disability beginning September 13, 1999.

The parties are advised that they have ten (10) days in which to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

        /S/ David D. Noce
**DAVID D. NOCE**
**UNITED STATES MAGISTRATE JUDGE**

Signed on January 25, 2007.